# In the United States District Court
# for the Southern District of Georgia
# Brunswick Division

THE UNITED STATES OF AMERICA
for the Use and Benefit of TSI
TRI-STATE PAINTING, LLC,

     Plaintiff/Counterdefendant,

     v.

FEDERAL INSURANCE COMPANY,

     Defendant/Counterclaimant.

CV 216-113

## ORDER

Plaintiff TSI Tri-State Painting, LLC ("TSI"), dkt. no. 130, and Defendant Federal Insurance Company ("Federal"), dkt. no. 132, bring cross motions for summary judgment. For the reasons set forth below, both motions are **DENIED.**

## BACKGROUND

This case revolves around a project at the Naval Submarine Base in Kings Bay, Georgia ("the Base"). Dkt. No. 1. Specifically, this case is a contract dispute between TSI and Sauer, Inc., the general contractor, after a building TSI agreed to repaint at the Base was discovered to be coated in lead paint.

This lead paint, as well as issues with containment, led to extensive delays and increased costs for TSI in this project.

In September 2011, Sauer, Inc.[1] entered into a contract (the "Prime Contract") with the federal government through NAVFAC[2] to provide corrosion control repairs at Explosives Handling Wharf 2 building at the Base (the "Project"). Dkt. Nos. 130-1 at 1; 150-2 at 1-2; see also Dkt. No. 130-2 (the Prime Contract). The Project included removing existing protective coatings on certain surfaces, rehabilitating and refinishing those surfaces, and replacing the metal roof and wall panels, guardrails, and other components of the building. Dkt. Nos. 150-2 at 2; 130-2 at 5. Soon after contracting, Sauer secured a payment bond from Federal as part of its obligations under the Miller Act. Dkt. No. 85 ¶ 10; 40 U.S.C. § 3133 (2006). Federal is an insurance company which provides surety bonds to companies entering into construction contracts with the federal government. Dkt. No. 85 ¶¶ 2, 10.

In May 2012, Sauer requested that TSI submit a proposal to perform the blasting and industrial coatings work on the Project. Dkt. No. 150-2 at 2. The next month, the two parties executed a

---

[1] Federal is representing Sauer's interests in this litigation. For convenience, the Court refers to Federal and Sauer interchangeably in this Order.

[2] NAVFAC is the United States Naval Facilities Engineering Command, for which Sauer and TSI performed work at the Kings Bay Naval Submarine Base. NAVFAC was ultimately responsible for overseeing the Project.

contract for TSI to take on this work (the "Subcontract"). Id.; Dkt. No. 130-5. In a letter attached to its proposal, TSI agreed to perform this work for a base pay of roughly $6,500,000 founded, in relevant part, on three assumptions: 1) the coating to be removed would be "lead and hazardous free per the proposal request," 2) the work would last from June 2012 to July 2013; and 3) TSI would require use of rental equipment for only eleven months. Dkt. No. 130-5 at 36-38. As it turns out, those assumptions were not correct.

## A. Lead in the Paint

In October 2011, soon after Sauer executed the Prime Contract with NAVFAC, Sauer approached a subcontractor to perform the coating work for the Project. See Dkt. No. 72-7 at 2. This subcontractor performed paint chip laboratory tests, which revealed the presence of lead in detectable concentrations well above the levels requiring lead protocols. Dkt. No. 72-6 at 16-18 (indicating the presence of lead in concentrations between 21 and 28 parts per million (ppm)); see also Dkt. No. 142-6 (stating the smallest concentration of lead that turned into a "lead job" was 4 ppm).[3] The subcontractor shared these results with Sauer,

---

[3] Federal contests this fact, arguing that this subcontractor did not perform proof of performance ("POP") tests on the paint chips, which "is necessary for a party to *definitively* know whether a project contains lead." Dkt. No. 149 at 9 (citing Dkt. No. 142-6 at 125:21-126:2; 176:3-177:4). The Court will address this argument in Section I.B *infra*.

dkt. no. 72-4 at 51:18-56:17, 61:9-23, and subsequently refused to perform the blasting and painting work for the Project, dkt. no. 72-5 at 19:8-23.

Sauer then approached TSI in May and June of 2012 to perform the painting and blasting work, dkt. no. 72-4 at 80:6-10, but it did not share the results of the prior paint chip laboratory tests with TSI. Sauer provided TSI with existing Project documents which showed the presence of lead in limited areas of the jobsite—specifically, handrails which were to be removed prior to the beginning of the Project. Id. at 15:23-16:18. But Sauer's management told its team—which was working with TSI to craft the Subcontract between the two—not to "say anything about . . . doing any lead swabs, lead tests, anything like that" when referring to the cream-colored paint which covered the building and which TSI would be working on. Id. at 82:21-24. TSI also asked if Sauer or the prior subcontractor had performed any lead tests on the paint, and Sauer did not acknowledge the lead tests it had in its possession. Dkt. No. 142-7 at 13:1-25, 62:7-17. As such, TSI priced its bid on the assumption that only very limited areas of the jobsite contained lead.

As required by industry practice, though, TSI would perform its own test of the paint to determine the existence of lead. Dkt. No. 130-5 at 36. "Should the sample test results show the coating

to contain lead," TSI explained, "a price adjustment will be necessary from the owner." Id.

Upon executing the subcontract, TSI performed a POP test to determine whether the paint contained any lead or hazardous material. Dkt. No. 150-2 at 6. After the second and third POP tests confirmed the presence of lead in the paint to be blasted, NAVFAC issued a Stop Work Order in October 2012. Id. at 7.

## B. The Change Order Negotiations

Upon discovery of the lead, TSI and Sauer engaged in negotiations which produced a number of "Change Orders" in an effort to acknowledge the added costs of handling lead paint. Dkt. No. 142-4 ¶¶ 2-4. The first of these, issued in June 2013, was Change Order 7, in which Sauer agreed to pay TSI 49.22% of the lead-related funds it received from the government once the government issued its own unilateral modification to the Prime Contract. Id. at 7-8. The government did in fact issue this unilateral modification, id. ¶ 5, disbursing $5,770,790.14 to Sauer for lead-related issues with the Project, id. at 17. Upon issuing this modification, the government directed Sauer to resume performance, and in July 2013, TSI began work on the Project again after lead paint protocols were agreed upon. See Dkt. No. 85 ¶¶ 49, 52, 57-59.

In October 2013, Sauer and TSI began negotiations on Change Order 10, which purported to clarify the exact amount of funds TSI was due from Sauer as a result of the government's unilateral modification. Dkt. Nos. 134 at 5; 134-1 at 7-10. Federal and TSI disagree as to the import of Change Order 10, with Federal claiming it "increased TSI's contract price by $2,840,383.00," dkt. no. 134 at 5, while TSI argues Change Order 10 "did not offer any additional compensation or other consideration to TSI, but only sought to create additional terms concerning how the 49.22% recovery . . . would be paid and to remove protections accorded TSI in Change Order 7." Dkt. No. 142 at 13.

It is further disputed whether Change Order 10 was ever agreed to at all. Early in October 2013, a version of Change Order 10 was signed by TSI's President, Irene Pescinski. Dkt. No. 142-3 ¶ 9. TSI claims this signature was done by mistake due to an administrator's error and cites to a number of communications sent to Sauer seeking to undo this mistake, as well as continued negotiations between the two parties. See Dkt. No. 142 at 5-6 (citing Dkt. Nos. 142-4 ¶¶ 12-13; 142-5 ¶ 9; 142-2 ¶ 6; 142-3 ¶¶ 10-11). These negotiations continued, TSI contends, but the parties never agreed on final terms for Change Order 10 in TSI's view. Dkt. No. 142 at 7 (citing Dkt. Nos. 142-4 at 34-36, 39, 41, 43, 45, 48-49, 51; 142-5 ¶ 11). Federal does not dispute these

6

communications but notes that Ms. Pescinski herself "did not provide any written direction to Sauer to withdraw" Change Order 10, and that Change Order 10 was the only change order that listed the amounts TSI was due. Dkt. No. 149 at 3. Federal further notes that the $2,840,383.00 sum sent to TSI (due according to Change Order 10, Federal argues) was never returned or rejected, id., to which TSI responds that it was entitled to that sum based on Change Order 7, not 10. Dkt. No. 142 at 8. In any event, TSI and Sauer continued work on the Project in late 2013 and early 2014. (Cite).

## C. Containment Issues

After work resumed on the Project in July 2013, TSI ran into a number of other difficulties in its work to finish coating the jobsite with new paint. Due to a lack of proper containment protocols, water entered areas where TSI was working, affecting TSI's ability to wash, blast, prime, and finish the different enclosures on the jobsite. Dkt. No. 130-9 at 28, 34, 38, 43, 45. Water would enter the containment area, forcing TSI to "vacuum and remove all water from the containment, dry the surfaces that were otherwise ready for prime, dry out abrasive intended for re-use, re-blast steel exposed to oxidation, and repaint (stripe) as required." Dkt. No. 130-1 at 5 (citing Dkt. No 130-9 at 38).

These issues led to further delays and increased costs for TSI's work on the Project. Id.

7

**D. TSI's Use of Rental Equipment**

Over the course of the Project, TSI used rental equipment from a company named Trimerica Equipment Rental, LLC ("Trimerica"). Dkt. No. 142-5 ¶ 5. TSI included the cost of this rental equipment in its claim to Sauer and Federal, seeking to recover for the added cost of using this equipment beyond the eleven months stated in the Subcontract. See Dkt. Nos. 85 ¶¶ 121, 127; 142-1 ¶¶ 5-7. However, as Federal points out, TSI owns some of the equipment used during the Project, see dkt. no. 132-2 ¶ 20, for which it cannot recover under the Miller Act, and all equipment rented from Trimerica is similarly ineligible because Trimerica and TSI have common ownership and numerous other connections making Trimerica an "alter ego" of TSI. See Dkt. No. 150 at 5-6. For example, the two companies share an address, dkt. no. 132-2 ¶¶ 20-24, Trimerica's corporate registration lists TSI's phone number as contact information, dkt. nos. 149-1, 149-2, 149-3, and Trimerica and TSI have joint general liability and worker's compensation insurance policies, dkt. no. 149-4 ¶¶ 10-11.

Federal and TSI dispute whether Trimerica and TSI are alter egos, but both agree that the cost of the rental equipment from Trimerica is a "sum or sums justly due" to TSI only if they are not alter egos. See Dkt. Nos. 134 at 23-24; 142 at 25-26; see also 40 U.S.C. § 270b(a) (1986).

8

**E.  The Parties' Dispute and Sauer's Claim to NAVFAC**

In the ensuing years after work resumed from 2013 through 2015, TSI and Sauer encountered substantial difficulties in completing the Project, and in March 2016, two months after NAVFAC reported substantial completion on the Project, TSI submitted to Sauer a claim for payment.  Dkt. No. 150-2 at 7.  TSI submitted this same claim for payment to Federal about a month later.  Id. at 7-8.  After not receiving a response from either, TSI commenced this suit in August 2016.  Id. at 8; see also Dkt. No. 1.

Two years later, in August 2018, Sauer in its own capacity submitted a certified Contract Disputes Act claim pursuant to the Prime Contract to NAVFAC seeking recovery for additional compensation due to time extensions and higher costs related to the delays and problems which occurred during the Project.  Dkt. No. 150-2 at 8.  Made without any input or consent from TSI, Sauer's claim requested an increase of $18,611,616.10 to the contract price and noted that $8,965,299 from TSI's claim to Sauer is "appropriate for pass-through to the Government"—in essence, stating that TSI is due $8,965,299 in additional compensation. Id. at 12-13 (citing Dkt. No. 130-9 at 58).  It specifies the basis for the added amount for TSI is due to the unanticipated presence of lead in the paint, as well as the containment issues and delays in the Project, and acknowledges that "TSI[ ] was the most

significantly impacted [subcontractor] by the lead and other unforeseen conditions on the Project." Dkt. No. 130-9 at 23.

Sauer certified that its claim was made in good faith, dkt. no. 130-9 at 2, and is currently using this claim as the basis for litigation against NAVFAC before the Armed Services Board of Contract Appeals. Dkt. No. 130-10 at 142:14-143:21. Federal, as Sauer's surety, does not dispute the good-faith basis of Sauer's claim but stated that it is not clear whether TSI is owed additional compensation, and thus this issue is one for "the courts to determine[.]" Id. at 33:5-16, 52:4-22.

**F. Alleged Fraudulent Misrepresentations**

In early 2014, TSI received information showing Sauer may have known of the presence of lead in the paint covering the jobsite. Dkt. No. 72-8 ¶ 11. Sauer denied any such knowledge, though, and TSI tabled the issue and continued performance. Id.

In early 2019, during the course of discovery in this case, TSI deposed Sauer's former superintendent, Richard Davidson. Dkt. No. 72-4. Davidson, along with another Sauer official, Harry Angenendt, disclosed for the first time that Sauer knew about the results of the prior subcontractor's lead tests and Sauer officials told employees not to disclose this information. Dkt. Nos. 72-4 at 15:23-16:18, 61:9-65:23; 72-5 at 71:3-22.

**\* \* \***

Both parties have filed motions for summary judgment, see dkt. nos. 130-1, 134, which revolve around whether TSI is due additional compensation due to the unanticipated presence of lead on the Project and the numerous delays which occurred. The issues have been fully briefed, see dkt. nos. 130-1, 134, 142, 149, 150, 154, and the matter is ripe for review.

## LEGAL STANDARDS

### A. Summary Judgment

Summary judgment "shall" be granted if "the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute is "genuine" where the evidence would allow "a reasonable jury [to] return a verdict for the nonmoving party." FindWhat Inv. Grp. v. FindWhat.com, 658 F.3d 1282, 1307 (11th Cir. 2011) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)). A fact is "material" only if it "might affect the outcome of the suit under the governing law." Id. (quoting Anderson, 477 U.S. at 248).

The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). The movant must show the court that there is an absence of evidence to support the nonmoving party's case. See id. at 325. If the moving party discharges

this burden, the burden shifts to the nonmovant to go beyond the pleadings and present affirmative evidence to show that a genuine issue of fact does exist.  See Anderson, 477 U.S. at 257.

The nonmovant may satisfy this burden in one of two ways. First, the nonmovant "may show that the record in fact contains supporting evidence, sufficient to withstand a directed verdict motion, which was 'overlooked or ignored' by the moving party, who has thus failed to meet the initial burden of showing an absence of evidence."  Fitzpatrick v. City of Atlanta, 2 F.3d 1112, 1116 (11th Cir. 1993) (quoting Celotex Corp., 477 U.S. at 332 (Brennan, J., dissenting)).  Second, the nonmovant "may come forward with additional evidence sufficient to withstand a directed verdict motion at trial based on the alleged evidentiary deficiency."  Id. at 1117.  Where the nonmovant attempts to carry this burden with nothing more "than a repetition of his conclusional allegations, summary judgment for the [movant is] not only proper but required."  Morris v. Ross, 663 F.2d 1032, 1034 (11th Cir. 1981) (citing Fed. R. Civ. P. 56(e)). On cross motions for summary judgment, the Court views the facts in the light most favorable to the non-movant on each motion.  Chavez v. Mercantil Commercebank, N.A., 701 F.3d 896, 899 (11th Cir. 2012).

### B.  The Miller Act

Under the Miller Act, 40 U.S.C. §§ 3131-34, a prime contractor must furnish to the relevant government entity a payment bond "with

a surety satisfactory to the officer for the protection of all persons supplying labor and material in carrying out the work provided for in the contract for the use of each person." Id. at § 3131(b)(2). "The purpose of a Miller Act payment bond is to protect subcontractors and suppliers who provide labor and material for a federal project, because federally owned lands or buildings are exempt from the liens that would normally secure these parties' rights under state law." United States f/u/b/o Pertun Constr. Co. v. Harvesters Grp., Inc., 918 F.2d 915, 917 (11th Cir. 1990) (citing United States f/u/b/o Sherman v. Carter, 353 U.S. 210, 216 (1957)).

A subcontractor who has provided labor or material in carrying out work provided for in a contract furnished under the Miller Act, and who has not been paid in full within ninety days after finishing performance, has the right to bring a civil action on the payment bond. 40 U.S.C. § 3133(b)(1). Upon being sued, "a Miller Act surety stands in the shoes of its principal and is [thus] entitled to assert all the defenses that its principal may assert." United States f/u/b/o Jack Daniels Constr., Inc. v. Liberty Mut. Ins. Co., No. 8:12-cv-2921, 2015 WL 9460115, at *8 (M.D. Fla. Dec. 28, 2015) (citing Moore Bros. Co v. Brown & Root, Inc., 207 F.3d 717, 728 (4th Cir. 2000)); see also Centraal Stikstof Verkoopkantoor, N.V. v. Ala. State Docks Dep't, 415 F.2d

452, 458 (5th Cir. 1969) (explaining that these principles "are common rubrics of the law of suretyship.").

## DISCUSSION

TSI and Federal bring cross motions for summary judgment, in essence arguing about whether TSI is entitled to additional compensation from Sauer (and by extension, Federal) for its work and material used on the Project.  Because there are genuine issues of material fact as to whether TSI is entitled to these additional funds, both motions are **DENIED.**

## I.  Federal's Motion for Summary Judgment

Federal makes four arguments in support of its motion: 1) Change Order 10 constituted an accord and satisfaction, dkt. no. 134 at 9-12, 2) TSI cannot establish any fraudulent misrepresentations by Sauer, id. at 16-21, 3) TSI cannot recover in quantum meruit because it continued to perform under the Subcontract, id. at 12-16, and 4) TSI cannot recover the cost of the rental equipment because it owned some of the equipment it used, and it rented the rest from its alter ego Trimerica (meaning it essentially rented equipment from itself), id. at 21-24.  All four of these arguments do not merit judgment as a matter of law in Federal's favor.

**A. It is a jury question whether Change Order 10 constitutes an accord and satisfaction.**

Federal first argues that Change Order 10, which purported to send $2,840,383.00 to TSI according to Change Order 7 and unilateral modification 6, resolved any disputes regarding the unanticipated presence of lead.  Dkt. No. 134 at 9.  This change order expressly limited recovery due to lead paint to the $2,844,383.00 paid to TSI at that time and stated that this adjustment "constitute[d] full and equitable adjustment for the change described herein and any associated delay, acceleration, rescheduling, disruption impact and cumulative impact with other changes."  Dkt. No. 134-1 at 10.

TSI contends that Change Order 10 was never agreed to because Ms. Pescinski's signature was accidental, and numerous emails show there was never a meeting of the minds.  Dkt. No. 142 at 11-12.  TSI further argues that there was no consideration for Change Order 10, and that even if it was agreed to, it should be rescinded under the doctrine of unilateral mistake.  Id. at 12-16.

Under Georgia law,[4] accord and satisfaction occurs "where the parties to an agreement, by a subsequent agreement, have satisfied the former agreement, and the latter agreement has been executed."

---

[4] The Court pauses to note that this dispute centers on determining whether a contract was agreed to, and as a matter of substantive law the Court applies Georgia law, the state where this dispute arose, in resolving it.  See Erie R.R. Co. v. Tompkins, 304 U.S. 64 (1938).

O.C.G.A. § 13-4-101. Such agreements are generally found valid and binding on the parties, but in order to execute the latter agreement, there must be a meeting of the minds. Moreno v. Strickland, 567 S.E.2d 90, 92 (Ga. Ct. App. 2002). This requires "[a] definite offer and complete acceptance, for consideration[.]" Id. (citing Herring v. Dunning, 446 S.E.2d 199 (Ga. Ct. App. 1994)). "As a general rule, whether there is accord and satisfaction is a question for the jury," Woodstock Road Investment Properties v. Lacy, 254 S.E.2d 910, 912 (Ga. Ct. App. 1979) (citation omitted), and the existence of mutual assent for an accord and satisfaction is ordinarily a jury question as well, see Mayer v. Turner, 234 S.E.2d 853, 855 (Ga. Ct. App. 1977).

Here, taking all reasonable inferences in favor of the non-moving party, it appears that despite Ms. Pescinski's signature on Change Order 10, neither party believed there to be a meeting of the minds in the time before or after Ms. Pescinski's action. Federal argues that Ms. Pescinski's signature on Change Order 10 should be the beginning and end of the discussion, but of course this is not a matter of contract interpretation. Rather, this dispute centers around whether Change Order 10 was agreed to at all, and "[i]n making that determination, 'the circumstances surrounding the making of the contract, such as correspondence and discussions, are relevant in deciding if there was mutual assent

16

to an agreement, and courts are free to consider such extrinsic evidence.'"   Frickey v. Jones, 630 S.E.2d 374, 376 (Ga. 2006) (quoting Cox Broadcasting Corp. v. National Collegiate Athletic Ass'n, 297 S.E.2d 733, 737 (Ga. 1982)).

This extrinsic evidence shows a genuine issue of material fact exists as to whether the two parties believed there was mutual assent at the time Ms. Pescinski signed Change Order 10.   In support of mutual assent is a declaration by James Rossini, a Sauer official, who states he executed Change Order 10 and sent $2,840,383.00 to TSI once he received the signed copy, and that this sum was due purely because of Change Order 10.  Dkt. No. 134-1 ¶¶ 4-6.   In opposition to mutual assent is Peter Lignos, a Project Administrator for TSI who handled negotiations on Change Order 10, and Irene Pescinski's declarations, as well as emails between TSI and Sauer before and after Ms. Pescinski signed Change Order 10.   See Dkt. Nos. 142-3, 142-4.   Mr. Lignos states Ms. Pescinski signed Change Order 10 due to an administrator's error while he was out of the office, dkt. no. 142-4 ¶ 11, and that upon his return he immediately sought to undo this supposed mistake, id. ¶¶ 12-14.   Ms. Pescinski, in her own declaration, says the same.  Dkt. No. 142-3 ¶¶ 9-10.

Mr. Lignos and Ms. Pescinski go on to state that a Sauer employee returned the signed Change Order 10 and the two parties

engaged in further negotiations.  Dkt. Nos. 142-3 ¶¶ 11-12; 142-4 ¶¶ 15-21.  These negotiations were ultimately unsuccessful, id., and Mr. Lignos states (and the emails show) a belief that the two parties believed Change Order 10 was never agreed to.

Federal argues that these declarations and emails notably do not include any written directions from Ms. Pescinski to Sauer that her signature was mistaken.  Dkt. No. 149 at 4-5.  Federal further argues that TSI never returned the $2,840,383 that Federal sent due to Change Order 10, showing that Change Order 10 must have been agreed to.  Id. at 3.  TSI responds that it is entitled to those funds due to Change Order 7, and as such does not need to return those funds in order to repudiate the existence of Change Order 10.[5]  See Dkt. No. 142 at 13.  These arguments both have

---

[5] The Court acknowledges Federal's back-up argument that Change Order 7, by itself, acts as a full and equitable adjustment for the lead-related impact on the Project.  Dkt. No. 149 at 6-7.  This argument fails, though, because Change Order 7 expressly included a full reservation of claim rights by TSI that it should have been paid more than what was paid under unilateral modification 6.  See Dkt. No. 142-4 at 7.  Notably, Change Order 10 did not contain this language.  Id. at 17-20.  And to the extent the release language in Change Order 7 contradicts the reservation-of-rights provision earlier in the change order, the Court notes that the reservation-of-rights provision controls.

Where there exists a conflict between two provisions in a contract, "a limited or more specific provision will prevail over one that is more broadly inclusive."  Hearn v. Old Dominion Freight Lines, 324 S.E.2d 517, 518 (Ga. Ct. App. 1984).  As such, the reservation-of-rights provision, which names the parties and the government and refers to a specific instance in which TSI reserves its right to sue later on, controls over the more general language at the end of Change Order 7.  Compare Dkt. No. 142-4 at 7, with id. at 8.

merit and show a clear and lively dispute about a material fact: whether Change Order 10 was agreed to or not.  A reasonable juror could find either there was mutual assent or there was not.  It is improper to grant summary judgment to Federal at this time, and, as such, Federal's motion for summary judgment is **DENIED** on this ground.[6]

## B. TSI properly alleges fraudulent misrepresentation and fraud.

Federal next argues that TSI cannot recover because its only right of recourse is under the Subcontract, and TSI does not allege evidence establishing fraud or fraudulent misrepresentations on Sauer's part.  Dkt. No. 134 at 16-20.  Under Georgia law, the tort of false misrepresentation has five elements.  TSI must show (1) that Sauer made false representations, (2) that Sauer knew those representations were false at the time, (3) that Sauer made the representations intending to deceive TSI and induce it to perform the painting and blasting work on the Project, (4) that TSI justifiably relied upon those representations, and (5) that Sauer's misrepresentations resulted in damages and loss to TSI. See Grand Master Contracting, LLC v. Lincoln Apt. Mgmt., LP, 724 S.E.2d 456, 458 (Ga. Ct. App. 2012).  Acknowledging that this Court

---

[6] The Court also notes that TSI and Federal dispute whether Change Order 10 could be rescinded under the unilateral mistake doctrine.  See Dkt. Nos. 142 at 13-16; 149 at 5-6.  Since summary judgment is denied on the ground of mutual assent, it is not yet clear whether there *was* a contract to rescind, so the Court need not resolve this dispute presently.

earlier found TSI had properly alleged these two claims, see dkt.
no. 84 at 10, Federal argues that this Court can still consider
whether TSI has shown enough evidence for a claim of fraud or
fraudulent misrepresentation.  See Dkt. No. 149 at 8-9 (discussing
the "law of the case" principle).  The Court agrees that Federal
is not barred from arguing TSI's claims are baseless.  See Castro
v. United States, 540 U.S. 375, 384 (2003) (holding the "law of
the case" doctrine does not "limit the courts' power").  But
because TSI has produced evidence showing Sauer officials may have
known of the presence of lead in the paint and affirmatively hid
this knowledge from TSI when TSI was preparing its bid, Federal's
motion for summary judgment is **DENIED** on this ground.

As to the first two elements of false representation, there
is *at least* a genuine dispute over whether Sauer knowingly made
false representations.  Deposition testimony shows that before
submitting its bid on the Project, TSI officials inquired about
whether the paint to be blasted contained lead and Sauer employees
withheld relevant information.  See Dkt. Nos. 72-4 at 15:23-16:18,
61:9-65:23, 80:11-83:13; 72-5 at 71:3-22.  Sauer officials'
depositions show that Sauer was aware that a potential
subcontractor had conducted a "lead swab test" on paint which
covered the jobsite and found it contained lead.  Dkt. No. 72-4 at
56:1-17.  Sauer and the subcontractor tested the paint in two

different locations, id., and those results were shared with Jim Kleipzig, Sauer's project manager. Id. at 61:9-23. When TSI officials inquired about whether the paint contained lead, though, Sauer did not acknowledge the lead tests it had in its possession. Dkt. No. 142-7 at 13:1-25, 62:7-17. Further, Sauer employees were told by Sauer officials not to disclose this information to TSI when TSI requested information about the Project. Dkt. Nos. 72-4 at 15:23-16:18, 80:11-83:13. This evidence could lead a reasonable juror to find that Sauer affirmatively made false representations to TSI (that the Project did not contain lead paint, except in a few cordoned-off areas), and that it did so knowing they were false (knowing the paint covering the jobsite did, in fact, contain lead).

Federal makes a doomed argument that Sauer's officials did not know the paint contained lead because the only way "for a party to definitively know whether a project contains lead" is through a POP test, which occurred only after TSI executed the Subcontract. Dkt. No. 149 at 9. "Simply put," Federal concludes, "until the POP was performed, *there was no knowledge to withhold*." Id. at 10 (emphasis added). This argument fails because it is of no matter that testing was not done to *conclusively* prove the presence of lead in the paint—that is not what Sauer misrepresented. Sauer misrepresented its knowledge of the *strong likelihood* of lead in

the paint, a fact which would have likely pushed TSI to conduct its own testing on the paint before submitting its bid.  As such, a reasonable juror could find the first two elements satisfied.

As to the third element of false representation, there are facts which support the conclusion that Sauer made false representations with the intent to induce TSI into submitting a bid for work on the Project.  Indeed, the deposition testimony shows Sauer officials told employees not to disclose the lead information just before TSI came onto the jobsite *for the purpose* of ensuring TSI's site visit, which would have been the time for TSI to conduct its own lead testing, did not add another hurdle to the bid submission process.  Id. at 80:11-81:1.  As such, a reasonable juror could find Sauer intended to hide this knowledge when TSI was preparing its bid so that TSI would submit a bid.

Next, the Court addresses the matter of reasonable reliance upon said false representations.  Federal points to the Subcontract itself, arguing that TSI couldn't have reasonably relied upon representations that there was not lead in the paint because the Subcontract states:

> 4. TSI expects the coating to be lead and hazardous free per the proposal request. However, as required by SSPC QP2, TSI will submit a paint chip sample for analysis to confirm this before we commence surface preparation. Should the sample test results show the coating to contain lead, a price adjustment will be necessary from the owner.

Dkt. No. 130-5 at 36; Dkt. No. 134 at 20-21.  This argument is belied by the fact that TSI likely would not have been able to obtain surety bond credit for the Project had it made its bid as a lead paint job, instead of a lead-free paint job.  See Dkt. No. 142 at 4 (citing Dkt. Nos. 142-6 at 29:2-30:23, 147:10-148:10; 142-7 at 61:4-13).  TSI made its bid without any knowledge of the lead, and, indeed, TSI needed there to be no knowledge of the lead in order to even make a bid in good faith.  Id. (citing Dkt. Nos. 142-6 at 147:10-148:10; 142-7 at 60:16-61:13).  Federal's argument that TSI was able to make a change order due to the above-quoted language does not defeat TSI's claim because it is possible for a party to rely upon a representation while retaining the right to later negotiate in case that representation turns out to be false.

Finally, the Court addresses the matter of damages.  Federal looks, again, to Change Order 10 and argues TSI has already received payment for any damages flowing from the discovery of lead.  Dkt. No. 149 at 14.  This Court, having already found a jury question as to whether the parties actually agreed to Change Order 10, repeats this conclusion and finds that there is a genuine dispute of material fact as to whether Change Order 10 actually constitutes a full and equitable adjustment for the discovery of the lead.  It must be noted, though, that TSI's damages can relate *only* to the presence of the lead—TSI's claim for fraudulent

misrepresentation necessarily cannot include damages related to alleged water containment breaches because those did not flow from the discovery of lead. See Conner v. Hart, 555 S.E.2d 783, 788 (Ga. Ct. App. 2001) (noting a party must show actual damages which flowed from the fraud alleged).

In sum, TSI—the non-movant—has pointed to evidence which, in taking all reasonable inferences in its favor, could lead a reasonable juror to find Sauer committed fraudulent misrepresentation. As such, Federal's motion for summary judgment is **DENIED** on this ground.

## C. TSI could recover in quantum meruit

Federal next argues that TSI cannot recover in quantum meruit because there is evidence showing TSI affirmed the contract, and thus its only avenue for relief is suing based on the contract. Dkt. No. 134 at 12-16. This argument, however, does not acknowledge that, reading all reasonable inferences in TSI's favor, TSI did not discover Sauer's allegedly fraudulent acts until 2019, and thus it is not foreclosed from rescinding the contract and recovering in quantum meruit.

"Two actions are available to one who was fraudulently induced by misrepresentations into entering a contract: he can affirm the contract and sue for breach or seek to rescind and sue in tort for fraud and deceit." Carpenter v. Curtis, 395 S.E.2d 653, 655 (Ga.

24

Ct. App. 1990); see also Kobatake v. E.I. DuPont De Nemours and Co., 162 F.3d 619, 625 (11th Cir. 1998). One cannot have it both ways, though—rescinding the contract gives up those benefits bargained for in the contract, but affirming the contract prevents a party from attaining damages outside of the contractual remedies available. Kobatake, 162 F.3d at 625.

And in order to make such a decision, a party must have "full knowledge of all the material circumstances of the case." Flair Fashions, Inc. v. SW CR Eisenhower Drive, Inc., 427 S.E.2d 56, 57 (Ga. Ct. App. 1993). Upon attaining this "full knowledge," the party must promptly rescind the contract or risk waiving their right to do so. Id. Some material circumstances are easily identifiable: for example, the names of a tenant's neighbors, id., or the square footage of the space the tenant is occupying, Nguyen v. Talisman Roswell, LLC, 585 S.E.2d 911, 913 (Ga. Ct. App. 2003). In circumstances like these, a party must immediately rescind the contract in order to sue based on fraud. However, where, as here, TSI's claim concerns Sauer's internal discussions and decision to allegedly withhold material information from TSI during the bidding process, it is likely that TSI did not have "full knowledge of all material circumstances of the case" until those discussions were known by both sides. Flair Fashions, 427 S.E.2d at 57.

Federal's arguments turn on whether TSI had "full knowledge" of the fraud in 2014 or 2019: if in 2014, TSI definitively affirmed the contract by proceeding with performance; if 2019, though, TSI promptly rescinded the contract. Federal argues that TSI's letter stating it believed Sauer "likely had knowledge of the widespread presence of lead containing materials on this Project *prior to* the submission of [TSI's] bid" is enough to determine as a matter of law that TSI had full knowledge of the fraud. Dkt. Nos. 72-9 (emphasis in original); 149 at 10. This argument has some merit— the letter acknowledges the possibility that Sauer had some knowledge of the presence of lead in the paint covering the jobsite, and as it turns out that was exactly the case. However, the fatal issue with this argument is that Sauer strongly denied this accusation.

In its response to TSI's letter, Sauer listed a chronology of facts about lead testing done at the jobsite, stating "[t]his chronology demonstrates that Sauer had *no knowledge* of the lead in the beige colored paint prior to the receipt of the [first POP test]." Dkt. No. 72-10 at 3 (emphasis added). Sauer sent another letter a month later again denying any knowledge of the presence of lead, stating "the facts are *abundantly clear* that Sauer was not aware this was a lead abatement project until August of 2012," and that TSI "has failed to provide any meaningful document or

26

other source of information to support its *ridiculous allegation* that 'Sauer had knowledge'" of the presence of lead in the paint. Dkt. No. 72-11 at 6 (emphasis added).   Making a reasonable inference in TSI's favor, these letters put the matter to bed, and it was not until TSI deposed Richard Davidson and Harry Angenendt (two Sauer officials) in early 2019 that TSI could demonstrate "full knowledge" of Sauer's alleged misrepresentations.

Because there is a genuine dispute of material fact as to whether TSI's suspicions amounted to "full knowledge" of the alleged fraud, Federal's motion for summary judgment is denied as to TSI's claim to recover in *quantum meruit*.

### D. A jury question exists as to whether TSI and Trimerica are alter-egos

Finally, Federal argues that TSI cannot recover the cost of rental equipment because 1) TSI owns some of the rental equipment, and 2) Trimerica is an "alter ego" of TSI, and thus TSI also owns Trimerica's rental equipment.   Relying on the notion that the use-value of owned equipment is more akin to "lost profits" than "actual expenditures for labor or materials utilized in the performance of the subcontract," and thus not recoverable under the Miller Act, Federal argues TSI should not be able to recover for either type of expenditure.   See U.S. f/u/b/o Pertun Constr. Co., 918 F.2d at 915; Dkt. No. 134 at 23-24.   This argument has

merit as to the owned equipment that was not "substantially consumed" during the Project. See United States f/u/b/o J.P. Byrne & Co. v. Fire Ass'n of Philadelphia, 260 F.2d 541, 544 (2d Cir. 1958). But since the evidence shows that all owned equipment was substantially consumed, and because a jury question exists as to whether TSI and Trimerica are alter egos of one another, summary judgment must be **DENIED** on this ground.

 *1. The Owned Equipment*

 The Miller Act enables a subcontractor to recover the cost of labor and material supplied on a federal government project.  40 U.S.C. § 3133.  A wide variety of materials can form the basis of a Miller Act payment claim, including consumed equipment and the cost of rental equipment, but not the cost of tools or equipment that was not "substantially consumed" during the construction project.  See United States f/u/b/o Bros. Builders Supply Co. v. Old World Artisans, Inc., 702 F. Supp. 1561, 1565-66 (N.D. Ga. 1988).  Federal argues that TSI is seeking to recover for tools and equipment it already owns, dkt. no. 134 at 23, but TSI explains these charges and costs are "small tools and vehicles used by TSI employees for transportation to and from the jobsite," dkt. no. 142 at 9, and since the cost related to the vehicles is included in TSI's overall general conditions costs that form TSI's field overhead expense, the small tools are what Federal takes issue

with.  As such, this argument turns on whether these small tools were "material" as opposed to "tools" under the Miller Act.  See Old World Artisans, 702 F. Supp. at 1565-66.

Starting with general principles, it is well-settled that in interpreting the Miller Act, "courts have refrained from an all-inclusive definition of 'material furnished in the prosecution of the work.'"  Id. at 1565 (citing Fire Ass'n of Philadelphia, 260 F.2d at 544). As such, "[w]hile material provided for the work is recoverable, 'the cost of tools may not be claimed under the Miller Act' because they are equipment which the subcontractor may continue to use and are not consumed in the public project." Id. (quoting Ibex Indus., Inc. v. Coast Line Waterproofing, 563 F. Supp. 1142, 1146 (D.D.C. 1983)).  What makes the difference is whether the tool "may reasonably be expected to be removed by the contractor and used in subsequent jobs[.]"  United States f/u/b/o Sunbelt Pipe v. United States Fidelity, 785 F.2d 468, 470 (4th Cir. 1986).  Large equipment, such as a crane, would be properly classified as capital equipment (and not recoverable), whereas something "reasonably expected to be consumed, or substantially consumed, in the performance of the work" is properly classified as materials.  Old World Artisans, 702 F. Supp. at 1566 (quoting United States f/u/b/o Sunbelt Pipe v. United States Fidelity, 785

F.2d 468, 470 (4th Cir. 1986)).  This determination is made from the supplier's point of view.  Id.

Here, the small tools Federal takes issue with are, according to TSI, "purchased on a per-project basis and generally do not last from job to job."  Dkt. No. 142 at 9 (citing Dkt. No. 142-1 ¶ 6).  Federal does not refute this declaration with any evidence of its own, but the Court need not rely on that—it is enough to show that, from TSI's point of view, a several year comprehensive project to blast existing paint and coat a submarine base with new paint is extensive enough to wear out most of, if not all, the small tools used in the project.  See Mass. Bonding & Ins. Co. v. United States f/u/b/o Clarksdale Mach. Co., 88 F.2d 388, 389 (5th Cir. 1937) (holding replacement parts for trucks were considered material and comparing them to "shovels, drill points, and the like, [which] though equipment in a sense, because they wear out quickly and break often, are more like materials consumed in, but not built into, the work").  As such, TSI may be able to recover for the cost of these small tools.

## 2. Trimerica as an Alter Ego

Federal next argues that Trimerica and TSI share enough corporate formalities to be considered alter egos of one another. Dkt. No. 134 at 23-24.  As such, Federal claims, TSI owns the capital equipment it rented from Trimerica, and thus it cannot

recover these costs. Federal's argument, at bottom, concerns a matter of state law as to whether TSI and Trimerica are "alter egos" of one another.

Under Georgia law, the corporate form may be disregarded "when it is shown that the corporate form has been abused." <u>Baillie Lumber Co. v. Thompson</u>, 612 S.E.2d 296, 299 (Ga. 2005). "[I]t is necessary to show," under this doctrine, "that the [parent company] disregarded the corporate entity and made it a mere instrumentality for the transaction of their own affairs; that there is such unity of interest and ownership that the separate personalities of the corporation and the owners no longer exist." <u>Id.</u> (quoting <u>Heyde v. Xtraman, Inc.</u>, 404 S.E.2d 607 (Ga. Ct. App. 1991)). "Great caution should be exercised when disregarding the corporate entity," and as such this determination is "a fact question which should ordinarily be submitted to the jury[.]" <u>Najran Co. for Gen. Contracting & Trading v. Fleetwood Enters., Inc.</u>, 659 F. Supp. 1081, 1096 (S.D. Ga. 1986) (quoting <u>Bass v. Citizens & So. Nat. Bank</u>, 309 S.E.2d 850 (1983); <u>Luckett v. Bethlehem Steel Corp.</u>, 618 F.2d 1373, 1379 (10th Cir. 1980)).

Federal points to several pieces of evidence in support of its claim: 1) TSI and Trimerica have the same owners, 2) they share the same address, and 3) Trimerica allegedly charges TSI a higher rate for renting equipment than it typically charges and at rates

which exceed the rates set forth in the contract between Trimerica and TSI.  See Dkt. No. 149 at 15-16 (citing Dkt. No. 133 at 15-20).[7]

Starting with the third piece of evidence, the alleged rate hikes, Federal claims Trimerica charged as much as four times the agreed-upon rate to TSI for certain equipment during the contract. Id. at 16. This fact, as TSI notes, needs context.  It is true that TSI was charged $33,000 for one month of rental equipment after Trimerica and TSI earlier agreed on $8,500.  Dkt. No. 133 at 17.  But this change, according to Eric Pescinski, TSI's project manager, was due to "a change in the [scope of the] contract." Id.  And since "rates change and they vary all the time, depending on how busy the economy is," the $33,000 rate was "what the current market will bear."  Id. at 18-19.  Mr. Pescinski noted, at least twice, that he does not control the rates at Trimerica, and that TSI and Trimerica are "two separate businesses."  Id. at 18-20. Reading all reasonable inferences in TSI's favor, as the Court

---

[7] The Court notes that Federal also argues much of Trimerica's business involves leasing equipment to TSI and its affiliates, citing to a deposition of Gerard Rancourt, a specialty coatings manager for TSI who is testifying as an expert in this case on the effect lead had on the Project.  See Dkt. Nos. 134 at 7; 149 at 16.  Upon reviewing the portion of the deposition Federal submitted with its motion for summary judgment, the Court cannot find any mention of the alleged affiliate, "Advanced Marine Protection," or indeed any mention of Mr. Rancourt testifying about TSI's rental equipment.  See Dkt. No. 133 at 22-30.  Neither party has submitted the full transcript of Mr. Rancourt's deposition, and TSI has disputed this fact, see dkt. no. 143 at 7, so the Court will not consider Federal's argument in ruling on its motion for summary judgment.

must do at this stage, a reasonable juror could find Mr. Pescinski credible and thus find that Trimerica and TSI have not abused the corporate form. It is well-settled that credibility determinations are left to the jury. <u>Anderson</u>, 477 U.S. at 255.

Because the evidence does not show as a matter of law that TSI attempted to "work an injustice" such that disregarding the corporate entity is warranted, <u>Baillie Lumber Co.</u>, 612 S.E.2d at 299, Federal's motion for summary judgment is **DENIED** on this ground.

## II. TSI's Partial Motion for Summary Judgment

In its partial motion for summary judgment, TSI argues that neither Sauer nor Federal dispute that TSI is entitled to $8,965,299. Dkt. No. 130-1 at 1-2. That is incorrect, though, so TSI's motion must also be **DENIED.**

TSI first argues that it is entitled to a judgment of $8,965,299 in its favor because Sauer has submitted a certified claim to the government requesting exactly that amount as "appropriate for pass-through" to TSI as payment for the multiple delays during the Project. Dkt. No. 130-1 at 13-15. Indeed, TSI notes, Federal has allegedly adopted Sauer's positions on TSI's claim, and thus TSI argues the matter is beyond dispute. <u>Id.</u> at 15-16. This "adoption" merits explanation, though, as Federal's

arguments contesting TSI's motion for summary judgment imply a disagreement between the two parties.

In support of its argument, TSI points to deposition testimony from Derek Popeil, a designated corporate representative for Federal. Id. at 15-16. TSI's claims about Mr. Popeil's testimony, however, lack context. Mr. Popeil explained that Federal does not dispute that "there's a basis for a claim, not necessarily the dollar amounts attached to it." Dkt. No. 130-10 at 100:1-2. Simply put, Federal does not dispute that there's a good-faith basis for Sauer to file a claim to the government for increased compensation, but does dispute whether TSI is due any of that additional compensation. Mr. Popeil reaffirms this understanding in his testimony, stating "ultimately the government is gonna make a determination as to the validity of this entire claim. And when that, we get that, there'll be the apportionment . . . we can determine what, if anything, falls down to [TSI.]" Id. at 110:16-21. This case is being litigated separate and apart from Sauer's claim before the Armed Services Board of Contract Appeals, and due to the factual disputes presented in this case the issue of whether TSI is due additional compensation is, in Federal's view, a "bona fide dispute between the claimant and the [ ] principal." Id. at 33:13-14.

Reading all reasonable inferences in Federal's favor, there is a genuine dispute of material fact as to whether TSI is entitled to any additional compensation, much less the alleged "undisputed" sum of $8,965,299.  Apart from Mr. Popeil's testimony, Federal makes three main counterarguments: 1) the accord and satisfaction argument, 2) the failure to rescind argument, and 3) the alter ego argument.

## A. Change Order 10 as an accord and satisfaction

Federal first counters that TSI is not due any additional compensation as a result of the lead discovery because Change Order 10 constitutes an accord and satisfaction.  Dkt. No. 150 at 8.  TSI responds twofold: 1) making the same argument it makes in Federal's motion for summary judgment, that the mistaken signature meant there was no meeting of the minds, and 2) that this argument would necessarily mean Sauer made its claim to the government in bad faith, amounting to fraud.  Dkt. No. 154 at 4-5; see also Severin v United States, 99 Ct. Cl. 435 (1943) (holding a contractor may sue the government only for damages incurred by its subcontractor for which the contractor is liable).  The evidence shows a reasonable juror could find TSI did not act reasonably in attempting to rescind the mistaken signature on Change Order 10.  Further, this issue isn't so clear that it is appropriate for the

Court to summarily determine Sauer's motives behind making its claim to the government.

Focusing on the evidence at issue, it is undisputed that 1) Change Order 10 was at one point signed by Irene Pescinski, the President of TSI; 2) Change Order 10 was the only order to mention the $2,840,383 dollar amount which Sauer sent to TSI; 3) Ms. Pescinski's subordinates communicated with employees at Sauer to rescind the allegedly mistaken signature, but 4) Ms. Pescinski herself never wrote anything to her employees or Sauer attempting to rescind said signature.

While these facts could be interpreted, as the Court did in Section I.A, to mean that Change Order 10 was never executed and TSI was due these funds under Change Order 7, the facts are capable of a different interpretation.  Taking all reasonable inferences in Federal's favor, Change Order 7 could be viewed as merely an agreement to negotiate the exact amount TSI was due, and Change Order 10 was the agreement to actually send the funds to cover the lead in the paint.  And while Ms. Pescinski allegedly told her subordinates to rescind her signature and continue negotiating, "[a] person who signs a contract without reading it is bound to its terms unless [she] can show an inability to read, an emergency, or the occurrence of some type of fraud which prevented [her] from reading the documents."  Malin v. Servisco, Inc., 323 S.E.2d 278,

279 (Ga. Ct. App. 1984).  Of course, the concern over whether Change Order 10 boils down to a question of a meeting of the minds, not whether Ms. Pescinski could not read, signed it during an emergency, or under the influence of some type of fraud—so the doctrine espoused in <u>Malin</u> cannot answer the question squarely in Federal's favor, either.

Simply put, whether Change Order 10 was executed or not boils down to weighing the credibility of Ms. Pescinski, her subordinates, and Sauer's employees, and analyzing the Change Orders.  And while it is unlikely that Sauer would submit a claim in bad faith to the government seeking damages it is not entitled to, such a finding is based on Sauer's credibility.  Such determinations are firmly within the province of the jury, and as such it would be improper for the Court to conclude TSI is entitled to additional compensation for lead-related delays at this juncture.

**B. TSI's alleged failure to rescind**

TSI argues, however, that it is not just entitled to additional compensation for lead-related delays, but also to alleged containment breaches, too.  Dkt. No. 154 at 4 n.3 (citing Dkt. No. 142 at 23-24).  TSI seeks to rescind the contract and attain damages through *quantum meruit*.

Here, again, the Court looks to the evidence submitted in support of Federal's motion for summary judgment. The evidence shows that in April 2014, TSI sent a letter stating as follows:

> We have recently become aware of records, however, indicating that Sauer likely had knowledge of the widespread presence of lead containing materials on this Project *prior to* the submission of our bid. Moreover, it appears that Sauer had planned to treat the Project as a lead job *before* permitting TSI to submit a bid with the assumption that our work would not require the handling of lead or other hazardous materials.

Dkt. No. 72-9 at 2. The letter went on to state TSI would conduct its own investigation into the matter. Id. Sauer sent two different responses forcefully denying the accusations, to be sure, but a jury could find that at this point TSI was at least suspicious of Sauer and was dealing with the matter at arm's length. Id. (stating TSI would conduct its own investigation into the matter). Where a party is suspicious of fraud, it cannot refuse to learn more in hopes of keeping the window open to rescind the contract on the basis of said fraud years later. See, e.g., Liberty Capital, LLC v. First Chatham Bank, 789 S.E.2d 303, 308-09 (Ga. Ct. App. 2016) (finding that in order to show justifiable reliance on a defendant's misrepresentations, a plaintiff must show he exercised his duty of due diligence); Rainey v. GAFVT Motors, Inc., 604 S.E.2d 840, 842-43 (Ga. Ct. App. 2004) (holding the same in a fraud context).

Casting all reasonable inferences in Federal's favor as the non-movant, a jury could find  that TSI was dealing with Sauer at arm's length in April 2014, such that it had the duty to conduct its own investigation independent of Sauer's assurances.  Further, a jury could find that discussions with the potential subcontractor likely would have turned up knowledge that they had shared this information with Sauer, bringing full knowledge of the alleged fraud to light.  As such, a reasonable juror could find that TSI did not act reasonably in taking Sauer at its word in April 2014 and thus affirmed the contract and foreclosed its *quantum meruit* claim.  Summary judgment must be **DENIED** on this claim.

**C.  TSI and Trimerica as alleged alter egos**

Finally, Federal counters TSI's motion by arguing that TSI and Trimerica are alter egos, and thus TSI cannot recover the cost of any rental equipment from Trimerica.  Dkt. No. 150 at 13.  The Court, having found this determination is at bottom a credibility issue that should be submitted to the jury, see supra, Section I.D, **DENIES** summary judgment on this ground as well.

**CONCLUSION**

For the above reasons, TSI's partial motion for summary judgment, dkt. no. 130, and Federal's motion for summary judgment, dkt. no. 132, are both **DENIED**.  The parties' are **ORDERED** to file their proposed pretrial order by   July 8, 2022   .

**SO ORDERED** this 9th day of May, 2022.

_____
HON. LISA GODBEY WOOD, JUDGE
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF GEORGIA